**The RAVENEL COMPANY, Inc.**
**v.**
**Wilson P. ABRAHAM.**
**Civ. A. No. 3171.**

United States District Court
E. D. Louisiana,
Baton Rouge Division.
Nov. 22, 1967.

H. K. Sweeney, Robert Williams, Jr., Baton Rouge, La., for plaintiff.

M. Aubrey McCleary, Jr., McCollister, Belcher, McCleary & Fazio, Baton Rouge, La., for defendant.

WEST, District Judge:

Defendant, Wilson P. Abraham, domiciled in Baton Rouge, Louisiana, was, at all times pertinent hereto, the owner, either individually or through corporations which he controlled, of certain motor hotel properties which he leased in April, 1964, to a corporation known as Parliament House, Inc. Plaintiff, Ravenel Company, Inc., was, at the time of the leasing of said properties, a real estate brokerage firm domiciled in Atlanta, Georgia. One of the properties so leased, and involved in this suit, is located in Baton Rouge, Louisiana, and the other is located in Atlanta, Georgia. Ravenel claims to have been the real estate broker employed by defendant, Abraham, to lease the properties, and further claims that it did, in fact, bring the parties to the leases together and that it is now entitled to its real estate brokerage fees for services rendered in connection with these leases. Defendant denies that he ever dealt with plaintiff as a real estate agent or broker and denies that the leases were consummated as a result of any activity on plaintiff's part.

 The Court has little difficulty in concluding that as to the Baton Rouge property, plaintiff has no valid claim for real estate commissions. Neither plaintiff corporation nor its employee who worked on this lease, Mr. Gordon W. Cahoon, were licensed as real estate agents, salesmen, or brokers under the laws of the State of Louisiana. Therefore, insofar as the Baton Rouge property is concerned, they are not entitled to recover any real estate commissions related thereto, whether they were instrumental in securing the leases or not. Despite the contention of plaintiff that Louisiana law denying the right of out of state real estate brokers to recover fees in connection with the handling of Louisiana properties relates only to *sales* of such properties and not to *leases*, this Court does not read such a distinc-

tion in the statutes involved. LSA–R.S. 37:1437 provides:

"No person shall engage in the business or capacity, either directly or indirectly, of a real estate broker, a real estate salesman, or a business chance broker unless he has a license under the provisions of this Chapter."

It is then provided in LSA–R.S. 37:1450 that:

"No person, not licensed in accordance with the provisions of this Chapter, shall recover any fee, claim or charge for brokerage in the courts of this state."

A real estate broker is defined in LSA–R.S. 37:1431(3) as follows:

" 'Real estate broker' means any person who, for a compensation or valuable consideration sells or offers for sale, buys or offers to buy, or negotiates the purchase or sale or exchange of real estate, or who leases or offers to lease, or rents or offers for rent, any real estate or the improvements thereon for others, as a vocation."

Plaintiff contends that these statutes do not prohibit one who negotiates for the purpose of bringing about *leases* of Louisiana properties, as distinguished from who negotiates for the purpose of bringing about a *sale* or *exchange* of Louisiana properties from suing in Louisiana courts for his fee even though he is not licensed in accordance with these statutes. The Court, however, does not accept this distinction. The statutes involved are clearly intended to prohibit a non-licensed person from engaging in any aspect of real estate business in the State of Louisiana for the account of others. As a means of enforcing these statutes, one who violates them is denied access to the courts of Louisiana for the collection of his fee. Insofar as plaintiff's claim here for fees earned in connection with the leasing of the Baton Rouge property is concerned, this case is governed by Horwitz v. Food Town, D.C., 241 F.Supp. 1, aff'd. 367 F.2d 584. Since neither the plaintiff nor its agents were licensed as real estate brokers pur-

suant to the laws of the State of Louisiana, they may not recover any real estate brokerage fees in connection with negotiations to lease or for any other activities connected with the leasing of Louisiana properties for others.

The dispute concerning the Atlanta, Georgia property, however, raises different questions. There is no question but that plaintiff has a right to earn and collect real estate brokerage fees if his services are contracted for and if the services rendered are in connection with real estate located in the State of Georgia. The questions, therefore, involved here are (1) whether or not plaintiff was employed as a broker to represent defendant in connection with the leasing of the Georgia property, and (2) whether or not plaintiff did in fact perform such services as entitled it to a brokerage fee. The Court concludes, after carefully studying all of the evidence in this case, that both of the above questions must be answered in the affirmative.

During the latter part of 1963, Gordon W. Cahoon, an employee and agent of plaintiff, Ravenel Company, Inc., was thoroughly familiar with the operations of Parliament House Motor Inns, Inc., a corporation engaged in the business of operating motor hotels, and knew that they wanted to expand their operations. Both Cahoon and Ravenel Company were licensed real estate salesmen, agents and/or brokers in the State of Georgia. Some time during the month of December, 1963, Cahoon learned that Abraham owned or controlled certain motor hotel properties, including one under construction in Atlanta, Georgia, containing 240 rooms, to be known as the Atlanta Royale Motor Hotel. At that time Cahoon, as an employee of Ravenel, acting in the capacity of a real estate broker, was looking for properties that might interest Parliament House. He called the president of a company known as Lamplighter Motor Inns of St. Louis, Missouri, concerning a facility which they were building in Atlanta. It was during this phone conversation that Cahoon was told that the defendant, Wilson Abraham, of Baton Rouge, Louisiana, might have some properties that might be available for lease. On December 31, 1963, Cahoon called Abraham by telephone and told him that he worked for Ravenel Company and inquired as to whether or not he, Abraham, had motor hotel properties that might be available for lease. Abraham was interested, and on the same day, December 31, 1963, he wrote to Cahoon giving a short description of the properties that were or would be available, including the one in Atlanta, Georgia. In this letter Abraham also outlined the rental payments that would be required on these properties. This information was then sent by Cahoon to Parliament House, and on January 15, 1964, Mr. Byron E. Prugh, of Parliament House, wrote Cahoon stating that Parliament House was interested but that they thought the suggested rental was too high. He suggested that Cahoon approach Abraham on a different rental basis proposed by Prugh. Prugh further suggested that Cahoon take Abraham to Birmingham, Alabama, to see one of Parliament House's typical operations. On January 24, 1964, Cahoon wrote to Abraham advising him that Parliament House was definitely interested and that Mr. Prugh would contact him to make a visit to inspect, among others, the available facility in Atlanta. In that letter Cahoon stated "I feel that your response to this group will be a good one, and we will be able to go with them on these and more areas—further as per your phone conversation, upon consummation of any transaction with this group, I will be operating in a standard real estate commission capacity." Cahoon, in this letter, also inquired as to possible financing of another project not in any way connected with the properties here involved. On January 28, 1964, Abraham answered this letter stating that he could handle the financing referred to by Cahoon, but he did not comment in any way on the other contents of Cahoon's letter of January 24. Between January 24 and March 23 of 1964, Abraham carried on negotiations directly with Mr. Prugh of Parliament House, and on

March 23, 1964, Cahoon wrote Abraham stating that he was glad to hear that he, Abraham, and Parliament House had just about completed negotiations for the leasing of the property in Atlanta, Georgia. He further stated in that letter "I would appreciate at your convenience if you would send me a copy of the agreements as they are completed on projects, as per enclosed letter from you, further outlining the commission agreement from you to The Ravenel Co., Inc., Broker, which shall be, as per our conversation, the standard real estate commission of five per cent per annum for the length of the lease, as paid to you, plus a procurement fee of the first month's rent. Abraham received this letter but did not answer it. There is no question but that as of that date, at the latest, Abraham knew that he was dealing with Cahoon, an agent of Ravenel Company, as a real estate broker, and that the Ravenel Company expected to be paid as a real estate broker for services rendered in connection with the leasing of this property. Abraham did not in any way contest this claim at that time, nor did he in any way indicate that the arrangement was not satisfactory. On the contrary, on April 15, 1964, he proceeded to consummate the lease with Parliament House on the Atlanta property.

Subsequent to this time Parliament House encountered financial difficulties and apparently were unable to pay the rental as it accrued on the various properties leased. Abraham was then apparently anxious for Cahoon to find other lessees to take over, and on June 11, 1964, he stated in a letter to Cahoon that he would give him " * * * five per cent real estate commission per annum on the entire deal should you consummate anything." At the time of this June 11 letter, Cahoon had left the employ of Ravenel and was employed by another real estate brokerage firm. He replied to that letter stating that if he did consummate new leases he would expect a fee of five per cent plus one-fourth of the first month's rent as a procuring fee. So once again when the question of re-

leasing the property came up, there is no doubt but that Mr. Abraham knew that Cahoon was acting in the role of a real estate broker. On June 26, 1964, the commission or fee not having been paid, Mr. James M. Ravenel made formal demand for payment and stated that if payment was not received within ten days, appropriate legal action would be taken. Abraham made no response to this demand, but on July 8, 1964, he wrote Mr. Ravenel stating that he was unhappy with the leases to the Parliament House and that Parliament House owed him three months' rent. He further stated that he was interested "in working a deal with the four places that I own and also the four places owned by the Parliament House."

This suit was filed on March 16, 1965.

It is clear from the evidence that there was no misunderstanding as to the fact that Mr. Cahoon, in his dealings with Mr. Abraham, was acting as an agent of The Ravenel Company, Inc., and in the capacity of a real estate broker, and that Mr. Abraham was dealing with him as such. There is also no doubt, from the evidence in this case, that it was entirely through the efforts of Mr. Cahoon that Mr. Abraham and the Parliament House were brought together in this transaction.

It is not important that the actual negotiations concerning the rental price and the other lease terms were carried on directly between Abraham and Parliament House. What is important is that it was only through the efforts of Mr. Cahoon that the parties to the ultimate transaction were brought together, making negotiations possible. For this effort, in accordance with what the Court believes to have been a clear understanding between the parties, The Ravenel Company is entitled to the fee agreed upon, i. e., the standard real estate fee for transactions of this kind.

Since it was agreed between the Court and counsel that if liability was found to exist, the parties would attempt to agree on the amount of the fee due, and

in the absence of such agreement further proceedings would be had to determine the amount of fee due, it is unnecessary at this time to attempt to determine the exact amount of the fee earned by plaintiff. Suffice it to say that the evidence before the Court sustains plaintiff's contention that it is entitled to recover the "standard realtor's fee for transactions of this kind" insofar as the leasing of the Atlanta property is concerned.

In the event an agreement cannot be reached between counsel as to the amount of this fee, the Court will hear further evidence at the request of either counsel to determine exactly what the "standard realtor's fee" is, and will, if necessary, refer this matter to a special master for the purpose of determining the amount of rent actually paid by Parliament House on the Atlanta property pursuant to the terms of the lease involved. Judgment will be entered accordingly.